UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------x

UNITED STATES OF AMERICA,

    - against -                                      Docket No. 23-CR-49 (RA)

CHARLES GUY,

        Defendant.

-------------------------------------x

# DEFENSE SENTENCING RECOMMENDATION

                                                  *Attorney for Charles Guy*

                                                  *Anthony L. Ricco*
                                                  ANTHONY L. RICCO, ESQ.
                                                  20 Vesey Street, Suite 400
                                                  New York, New York 10007
                                                  (212) 791-3919
                                                  *Tonyricco@aol.com*

Steven Z. Legon, Esq.
Of Counsel & On the Memorandum

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,

       - against -                          Docket No. 23-Cr- 49 (RA)

CHARLES GUY,

            Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x



       This Sentencing Recommendation is submitted pursuant to Rule 32 (f)(1) and (2) of the Federal Rules of Criminal Procedure which sets forth Charles Guy's objections to the Presentence Investigation Report (PSR) and his Sentencing Recommendation. Charles Guy requests that the Court impose a sentence of 78 months pursuant to 18 U.S.C.§ 3553(a) and *United States v. Booker*, 534 U.S. 220 (2005).

**I. Preliminary Note and Summary of Arguments Supporting The Sentence Requested**

       The request for a sentence at variance with the Guidelines is based upon grounds primarily related to the trauma that Charles Guy endured during his formative and teenage years, and how those experiences were compounded by the trauma that he endured during his young adult years, and how thus far in his life Charles Guy has been unable to escape the influences that has resulted in his incarceration during a substantial period of his adult years.

       In this case, Charles Guy entered a guilty plea pursuant to a plea agreement which contained an advisory sentencing range, as set forth in the Presentence Investigation Report, that is based upon a total offense level of 27 and a criminal history category of III, which carries a guideline imprisonment range of 87 months to 108 months.  See, Presentence Investigation Report (PSR), ¶ 80, page 19.  As recognized in the plea agreement, Charles Guy's sentence is subject to a mandatory minimum term of imprisonment of 5 years, along with 4 years of supervised release pursuant to  21 USC § 841(b)(1)(B).

       There is no doubt that Charles Guy's criminal history, will predominate and heavily influence

the ultimate sentence imposed by this court. The recommended application of the guidelines in the plea agreement of 87 to 108 months, which of course are no longer mandatory, are completely influenced by the commission of the offense, and Charles Guy's history of past prison sentences.[1]

However, there are significant mitigating factors present in Charles Guy's life narrative to suggest that the imposition of a sentence in the advisory range of 87 to 108 months is greater than necessary to reach the sentencing objectives of Congress and to punish and hold Charles Guy accountable for his relapse and return into criminal conduct. The not-so-subtle influences upon Charles Guy's life and his involvement in criminal conduct is not accounted for in the Sentencing Guidelines analysis (by the calculation employed by either Probation or upon agreement of the parties) and is also not accounted for or reconciled by focusing on his criminal conduct during his adult life, are his great loss of promise, and that notwithstanding the pain that he has endured throughout his life, Charles Guy remains a man so capable of redemption and of future promise.

While Charles Guy's past terms of imprisonment are important sentencing factors that the Court must consider, there are equally compelling negative risk factors present in the life of Charles Guy, along with his modest positive strides made while on supervised release and during his custody with the Bureau of Prisons which provide a basis for the imposition of sentence at variance with the guidelines. Those negative risk factors, which are prohibited and excluded from arriving at the numerical guidelines sentence per Guideline 5H1.12), include the neglect and abandonment resulting from the drug addiction and alcoholism of his parents, (PSR, ¶ 46, page 13 [father] and ¶ 50, page 14 [mother]); prolonged exposure to domestic violence, (PSR, ¶ 49, pages 13-14); Charles Guy's entry into drug trafficking during his teenaged years influenced by a manipulating older male role model, (PSR, ¶ 52, page 14); accompanied by Charles Guy's abuse of heroin as a teenager, (PSR, ¶ 67, pages 17). The modest positive steps include, *inter alia*, (1) Charles Guy's employment with the "*Reverse The Trend*" program,

---

[1] Based upon Charles Guy's past criminal conduct and the length of sentences previously served the Office of Probation, however, recommends a sentence of 96 months.

(PSR, ¶38, page 12); (2) Charles Guy has taken positive steps towards redemption as demonstrated by his earlier decision to enter a guilty plea in this case, (PSR, ¶ 21, page 8); (3) Charles Guy's involvement in positive educational courses and programs offered by the Bureau of Prisons while detained (PSR, ¶ 6, page 5)[2] ; and (3) the need to provide Charles Guy with a reasonable opportunity to develop a long over due relationship with Billy Guy, Jr., his 21 year old son (PSR, ¶¶ 54-55, page 15; and ¶ 59, page 16).

The above factors merit some mitigating value to balance the imposition of a sentence that is driven by the philosophy that incarceration is the most effective solution to change criminal conduct and upon the mind set that Charles Guy has not "*learned his lesson*." The above factors demonstrate that with support and insightful "*real time*" guidance, Charles Guy can free himself from a lifetime of the influences of negative risk factors and that is capable of reaching his redemption. Therefore, for the reasons fully explained below, the proposed sentence of 78 months (which is 9 months at variance with the low end of the guidelines of 87 months, and 18 months above the statutory minimum of 60 months) arrives at a sentence sufficient but not greater than necessary to achieve the goals of Congress.

## II.  Background/Guilty Plea

Summary of The Relevant Procedural Background

As the court is aware, on January 30, 2023, Charles Guy appeared before this court and pursuant to a plea agreement, and entered a guilty plea to a one count information that charged from at least November 2022, in the Southern District of New York, Charles Guy conspired with others to distribute and possess with intent to distribute 400 grams or more of fentanyl in violation of 21 U.S.C. §§841(b)(1)(A) and 846.[3]

---

[2]  While in the Bureau of Prisons in the past, Charles Guy earned a GED on September 17, 2014, and has participated in at least 40 additional courses. Charles Guy also participated in the Residential Drug Abuse Program (RDAP) while housed at FCI Petersburg Medium facility between 2018 and 2019. *See*, PSR, ¶38, page 11; ¶ 54-55, page 15; and ¶ 59, page 16). During his pre-trial detention in relation to this case, Charles Guy has taken Bookkeeping and Marketing courses. *See*, PSR, ¶ 6, page 5.

[3]  Under the terms of the plea agreement, the Government will accept a guilty plea to the lesser included offense of conspiring to distribute and possess with intent to distribute 40 grams and more of mixtures and substances containing a detectable amount of fentanyl, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(B). A violation of 21 U.S.C. §841(b)(1)(B) has a mandatory minimum of 60 months imprisonment, and 4 years up to life supervised release.

3

The Presentence Investigation Report

Pursuant to Rule 32 of the Federal Rules of Criminal Procedure, the United States Probation Office conducted an interview of Charles Guy and prepared a Presentence Investigation Report ("PSR"), which included, *inter alia*, a calculation of the applicable advisory Sentencing Guidelines. The PSR Guidelines calculation and analysis adopted the guideline that were set forth in the plea agreement. *See*, PSR, ¶ 23 through 3, pages 8-9.  The PSR, therefore, set the base offense level at a level 30, since the offense involved at least 400 grams but less than 1.2 kilograms of fentanyl as directed by Guideline §§2D1.1(a)(5) and (c)(5).  *See*, PSR, ¶ 24, page 8.

Reduction For Acceptance of Responsibility and Criminal History Category

Since Charles Guy accepted responsibility in a timely manner, he was granted a full three level reduction pursuant to Guideline § 3E1.1(a) and (b). *See*, PSR, ¶ 31 and ¶ 32, page 9.

Criminal History Category

Charles Guy's prior felony convictions establish a criminal history score of 3 points. *See*, PSR, ¶ 39, page 12.  However, since Charles Guy committed the instant offense while he was on supervised release, and additional 2 points are added as directed by Guideline, §4A1.1(d).  See, PSR, ¶ 40, page 12. With a total of 5 points, Charles Guy is therefore in Criminal History Category III. *See*, PSR, ¶ 41, page 12.  Based upon a total offense level of 27 and a Criminal History Category of III, the advisory Guidelines range is 87 to 108 months. *See*, PSR, ¶ 80, page 19.

Objections To The Presentence Investigation Report

Other than the two point enhancement in criminal history points for committing the instant offense while of Supervised Release, (PSR, ¶ 5 (b)(I), page 5, and PSR ¶ 40 and ¶ 41, page 12),[4] Charles

---

[4] In the absence of the 2 point enhancement for committing the offense while on Supervised Release, Charles Guy would be in Criminal History II.  Under Criminal History Category II, Charles Guy's guideline range is 78 to 87 months.  The Sentencing Commission has given notice to an amendment to the Guidelines which eliminates the two point enhancement.

Guy has no material objection to the advisory Guidelines calculation in the PSR, nor does he have a material objection to those portions of the P.S.R. that set forth the offense conduct in Part A or the criminal history in Part B, and/or the offender characteristics in Part C, other than set forth below.

> 1.  Charles Guy asserts that his mother died from complications related to cardiac failure contrary to what is stated in the paragraph numbered 46. Charles Guy also asserts that his father died from the ravages of a lifetime of heroin addiction, not from "natural causes" as stated in the paragraph numbered 46. *See*, PSR, ¶ 46, page 13. Charles Guy also states that the Joseph P. Addabbo Family Health Center is in Queens not Brooklyn, New York as stated in the paragraph numbered 71. *See*, PSR, ¶ 71, page 18.

The objections in paragraph 46 and 71 are not material to the offense level, criminal history category or overall guideline calculations, nor for consideration under 18 U.S.C. § 3553(a).

### III. Defendant's Sentencing Recommendation

As stated above, Charles Guy requests that the court impose a sentence at variance with the sentencing guidelines at 78 months incarceration, with a recommendation (or a no-position on whether) the sentence for the violation of Supervised Release in the District of New Jersey is served currently or partially concurrently pursuant to 18 U.S.C. §3553(a) and 18 U.S.C. §3661.

Not only does the court have authority under 18 U.S.C. §3553(a) but justice, fairness and mercy grounded in the nuanced mitigation presented herein, provides the grounds for this court to consider such a sentence upon Charles Guy, an offender with a long criminal history.

In honor of the June 2021 passing of Judge Jack B. Weinstein, just weeks before his 100th birthday, the defense begins its sentencing recommendation with a quote from one of his most insightful and often cited sentencing opinions:

> Pragmatism and a sense of fairness suggest reconsideration of our over reliance on incarceration. Though defendants are hemmed in by circumstances, the law must believe that free will offers an escape. Otherwise, its vaunted belief in redemption and deterrence—both specific and general— is a euphemism for cruelty. These defendants are not merely criminals, but human beings and fellow American citizens, deserving of an opportunity for rehabilitation. Even now, they are capable of useful lives, lived lawfully.

*United States v. Bannister*, 786 F.Supp.2d 617, 690 (EDNY 2011).   In contemplation of the defense

5

sentencing recommendation, I have given a great deal of thought to the fact that Charles Guy has had a long criminal history which has resulted in decades of incarceration throughout his adult life, and that he his returned to criminal conduct, notwithstanding his genuine efforts towards redemption, including his employment with the "*Reverse The Trend*" program.  See, PSR, ¶38, pages 10 through 12.

Defense counsel, however, has also given equal thought to arriving at a sentence recommendation that would be sufficient but not greater than necessary to punish Charles Guy, now age 55, but to do so consistent with the overall sentencing objectives of Congress, while resisting the urge to submit to "*enhanced incarceration*" as the solution to the difficult problems faced by many repeat offenders, who have struggled with re-entry after serving long prison terms.

Long Term Periods of Incarceration

The first factor that stands out when considering a sentence to impose in this case is the fact that Charles Guy has spent the majority of his adult life in the custody of state and federal penitentiaries over the past 30 years. *See*, PSR, ¶ 37 and ¶ 38, pages 10 through 12.

Back on July 20, 1990, Charles Guy, then 22 years of age, was arrested by Maryland state law enforcement authorities on various charges that included, *inter alia*, a conspiracy to distribute heroin, along with the distribution of cocaine and other related offenses.  On April 16, 1991, Charles Guy, was sentenced upon a guilty plea to various charges to 20 years, all to run concurrent with each other.  On that sentence, Charles Guy was released on from custody on March 27, 2002, after he served 11 years and 9 months in prison.  *See*, PSR, ¶ 37, page 10.  When he was released in March 2002, Charles Guy was 34 years of age.  With the exception of approximately 20 months, Charles Guy had spent his entire twenties and two years of his thirties in custody in Maryland state prison.

On January 26, 2011, 8 years, 11 months after his release from Maryland state prison, Charles Guy was arrested on federal conspiracy to distribute heroin charges.  *See*, PSR, ¶ 38, page 10.  In that case, it was charged that from 2009 through 2010, Charles Guy was a significant supplier of heroin to

6

an individual who was distributing heroin in and around a public housing development and within 1000 feet of a school in Baltimore. Pursuant to a guilty plea, where Charles Guy was held accountable for more than 1 but less than 3 kilograms of heroin and deemed a leader and organizer, and he was sentenced to a term of 240 months in federal prison. *See*, PSR, ¶ 38, page 10-11. As a result of changes in the federal sentencing guidelines related to the calculation of narcotics offenses, on December 1, 2016, Charles Guy's sentence was reduced to 151 months. *See*, PSR, ¶ 38, page 10-11. When Charles Guy was released from the Bureau of Prisons to Supervised Release on December 9, 2020, he was 52 years of age, and had served 9 years, 11 months in federal custody. Again, with the exception of approximately 24 months, Charles Guy had spent his entire forties and two years of his fifties in federal custody. With the exception of 8 years and 11 months, Charles Guy had spent virtually his entire adult life - from age 22 to 55 - in prison.

There are many who will look at Charles Guy's criminal history and conclude that the maximum or near maximum sentence should be imposed. The perspective is based upon the notion that Charles Guy has not "*learned his lesson,*" and that the propensity for criminal behavior has followed him into his fifties, even after serving more than 20 years in the penitentiary, and that he should, therefore, be punished harshly. And, while criminal history is an important guideline and statutory factor or consideration, criminal history does not stand alone in the assessment of factors that comprise the individual characteristics that make up Charles Guy. At age 55, Charles "Billy" Guy remains a complex man, an adult of considerable hard earned life experiences; a man who, notwithstanding decades in prison, has been able to maintain employment, to garner the love and respect of his family members and his son who is well on his way to living a prison free life. *See*, PSR, ¶ 55, page 15.

On December 9, 2020, Charles Guy walked out of prison and into the promise of his future - - a future free from a life of incarceration. And, by all accounts of his family members and friends, Charles Guy had finally put it all together. Charles Guy, who had obtained his GED while incarcerated within the Bureau of Prison, was employed and working with an outstanding program - "*Reverse The*

*Trend*" - designed to reach inner city youth. Add, above all, Charles Guy was reunited with his son, and he was well on the path to developing a relationship finally free from the constraints of prison bars.

However, in less than two years, Charles Guy had reverted back into criminal conduct involving the distribution of narcotics. A close and meaningful look at the powerful negative risk factors present in his formative and teenaged years helps provide insight into Charles Guy's relapse into criminal behavior. Those factors include his endurance and exposure to the alcohol and drug abuse of his parents contributing to his exit from his family home while a teenager; his introduction into the drug trade at a very young age by an individual that he admired and looked up to; and his introduction to the use of hard drugs, such a heroin, as a teenager. See, PSR, ¶ 67, page 17. While these negative risk factors are not offered as what Alan Dershowitz and others once decried as "*the abuse accuse*," they provide some insight into the Charles Guy's susceptibility to criminal conduct after decades of incarceration, and have value to assist the court in determining the length of punishment to be imposed.

<u>The Defendant's Background/Formative Years</u>

In this case, the PSR sets forth an accurate chronology of the family history and circumstances under which Charles Guy was born, raised and has lived his adult life when not incarcerated. See, PSR, ¶ 46, page 13 to ¶ 60, page 16. However, the PSR fails to provide a narrative on how the negative risk factors that comprise the chronology have converged to influence Charles Guy's adult conduct well into his fifties. And, perhaps most significantly, the PSR fails to accord or provide any meaningful significance or insight of why these judicially recognized mitigation factors were not included in the PSR's sentencing recommendation. The PSR, as I am sure the government will also argue at sentencing, focuses upon Charles Guy's periods of incarceration, without providing insight into how Charles Guy's life circumstances have influenced his criminal conduct and the subsequent terms of imprisonment.

As stated above, Charles Guy's was subjected to parental neglect resulting from drug and alcohol abuse, physical violence at home, and his young life was influenced by older individuals (whom he admired and looked up to), who ushered him into the narcotics trade and into his use of heroin as a

8

teenager.  See, PSR, ¶ 52, page 14; and See, PSR, ¶ 67, page 17.

The Presentence Report accurately reports that while born to the marital union of Charles Guy, Sr. and Charlice Guy (David) in 1968, as a boy and during his formative years, he was abandoned by his father who had a life long struggle with the throes of heroin addiction, an addiction ultimately resulted in his death sometime in the 1980's.  *See*, PSR, ¶ 46, page 13.  As a result of that abandonment, Charles Guy and his maternal half-brother, Damon Guy, were raised by their mother Charlice Guy, who also had the responsibility to care for her younger siblings.

The Presentence Report accurately reports that throughout his childhood and early teenaged years, Charles Guy, along with his brother and mother resided at 1520 Sedgwick Avenue, the same building in which other maternal family members, including his grandparents resided.  *See*, PSR, ¶ 46, page 13.  There is no question that Charles Guy was raised under circumstances not as dire as others who come before the court born and raised in public housing projects, however, the issues of abandonment, alcoholism, and the trauma of witnessing domestic violence were significantly present in the home.  *See*, PSR, ¶ 48, page 13 to page 14.

Throughout the 1970s, Charlice Guy maintained a long term, *off and on again*, relationship with a man known to young Charles Guy at that time as "Willie."  "Willie" subjected both is mother and his brother, Damon Guy, to bi-weekly episodes of physical abuse so severe, that often times Charles Guy's maternal grandfather would intervene in an attempt to protect them from harm.  *See*, PSR, ¶ 49, page 13 to page 14.  By the early 1980s, and his early teenaged years, Charles Guy's mother began a relationship with another man known as "Gene."  "Gene" showed no interest in, and had no relationship at all with young Charles Guy.  In fact, as a result of her relationship with "Gene," Charlice Guy began neglecting her relationship and parental responsibilities towards both Damon and Charles Guy.  *See*, PSR, ¶ 49, page 13 to page 14. Although Charlice Guy maintained employment throughout her adult life, she became increasingly depressed over her circumstances and drowned her pain in alcohol.  *See*, PSR, ¶ 50, page 14.

9

By age 16, young Charles Guy stopped attending high school, left the family residence, turned to the streets, and began living with his 21 year old girlfriend. See, PSR, ¶ 50, page 14. At that time period, the age differences were considerable. The circumstances that Charles Guy endured at home provided the gateway, and the relationships that he formed running from the negative risk factors at home brought him into circumstances with individuals who gradually ushered him, as a teen, into distributing and using hard drugs, which activity ultimately led to his arrest and conviction in Maryland state court. *See*, PSR, ¶ 52, page 14.

The above negative risk factors are not offered as an excuse for the commission of crime or to avoid responsibility (punishment) for the commission of crimes, (once derided by experts such as Alan Dershowitz as the "abuse excuse"), but rather to help explain Charles Guy's relapse into criminal conduct - an equally important narrative for the court consider in deciding the length of the sentence to impose in this case.

Although not a criticism, the PSR simply sets forth a chronology of events related to the life narrative of Charles Guy, but fails to account for or provide any insight into how these formidable risk factors continue to influence Charles Guy's judgment, notwithstanding his substantial years of incarceration.

The Continued Influence of Negative Risk Factors in the Era of Post Mass Incarceration

Many of us who practice before our courts over the decades have been around long enough to witness, first hand, the continued influence of negative risk factors upon offenders who have served substantial prison sentences and have been returned to society.

First, there is no question that enduring drug addiction or alcohol abuse by parents, along with being subjected to (witnessing) domestic violence at home, and teenage use of hard drugs such as heroin are, in the 21st Century, resoundingly recognized by scholarly research and the Department of Justice, as influential negative risk factors, which serve as strong predictors that foretell long term future criminal conduct. *See*, A Developmental Analysis of Children's Social Support Networks, Julie A.

10

Kriegler and G. Anne Bogat, Michigan State University (1985); Treating Complex Traumatic Stress Disorders (Adults): Scientific Foundations and Therapeutic Models, Herman, Judith Lewis, Guilford Publications (2009); *See also*, "*Defending Childhood*," the landmark report of the Attorney General's National Task Force on Children Exposed to Violence, Office of Juvenile Justice and Delinquency Prevention, Office of Justice Programs, U.S. Department of Justice (December 2012), which includes the Attorney General's December 12, 2012 Letter.[5]

The presence of drug and alcohol abuse by parents, and violence in the home, along with the lack of positive male role models, once referred to as the "*abuse excuse*" by many experts (See, "*The Abuse Excuse*," by Alan Dershowitz, Little Brown & Co. (October 1, 1994); Arenella, Peter. 1996. "*Demystifying the Abuse Excuse: Is There One?*" Harvard Journal of Law and Public Policy 19; Becker, Mary E. 1998. "*The Abuse Excuse and Patriarchal Narratives,*" Northwestern University Law Review 92), are brought to the attention of this court not as an *excuse* for criminal conduct, but rather that the court may have a complete perspective of the life circumstances of Charles Guy's life narrative, and his individual background and character, to provide guidance in consideration of the length of sentence to be imposed. In the exercise of discretion under 18 U.S.C. § 3553(a), this court has long given meaningful consideration to the presence of these troubling factors articulated by Judge Weinstein in his brilliant decision *United States v. Bannister*, 786 F.Supp.2d 617 (EDNY 2011).

In addition, sentencing is a critical event for the individual offender. Sentencing provides an offender with an opportunity for reflection and accountability that often eludes the offender outside of a custodial setting. Helping an offender understand the continued inter-relationship between endured

---

[5] As a result of the national phenomena of children and teens to the exposure to violence, domestic abuse and violence in their communities, the Attorney General assembled a blue ribbon commission of our nations most prominent psychologist and mental health experts to study the long term developmental impact of the children's exposure to violence and to make specific recommendations. See, Letter of the Attorney General Eric Holder to the Members of the Assembled National Task Force dated December 12, 2012. *Id.* See also, Department of Justice, Office of Juvenile Justice and Delinquency Prevention, Wyrick and Atkinson, National Institute of Justice, NIJ Journal No. 283 (April 29, 2021). "Examining the Relationship Between Childhood Trauma and Involvement in the Justice System," https://nij.ojp.gov/topics/articles/examining-relationship-between-childhood-trauma-and-involvement-justice-system

negative risk factors and present behavior, is part of a sincere effort to find solutions to help a repeat offender make better decisions and to correct the trajectory of life so that he can reach his human potential other than by relying upon the default of lengthy incarceration. Such an effort essential to the process of healing, and seeking true redemption, as offenders confront challenges upon re-entry into society. Through our meetings at the Metropolitan Detention Center, Charles Guy is recognizing that the presence of these powerful negative risk factors have been a key factor in his return to criminal conduct, even though he was making positive strides towards his transition back into society.

As stated above, these factors are not offered as an excuse for the commission of crime or to avoid responsibility for the commission of crimes, but rather to help explain Charles Guy's descent and return into criminal conduct - an equally important narrative for the court consider in deciding the length of the sentence to impose in this case, rather than simply focusing upon the default of lengthy incarceration.

The Life Journey Ahead - Rehabilitation and Redemption

In my sentencing submissions, I often honor an experience that I had at sentencing many years ago, as a young lawyer at the very dawn of my career as a defense attorney. More than 35 years ago, I appeared before the Hon. Leroy Kellum, a long retired and now deceased New York state court judge, who observed in his consideration of a sentence to impose upon an offender that the "*first step towards rehabilitation is recognizing that you have made a mistake and taking steps to correct that mistake.*"

The court will discover from a review of the record in this case, as confirmed by the government, that upon his arrest and arraignment, Charles Guy sought an early disposition of his case, and negotiated for an early plea disposition. This decision was an important first step.

From a review of the Presentence Investigation Report, it is clear that Charles Guy, notwithstanding his lengthy prison sentences, is a person who, as described by noted capital defense Bryan Stevenson, is "*far greater than the worst thing(s) that he has ever done.*" See, "*Just Mercy: A Story of Justice*

12

*and Redemption*" Spiegel & Grau (2014), by Stevenson, Bryan.  As the court can read from the Presentence Investigation Report, and from the letters of support, over the years Charles Guy has struggled through the trial and tribulations of life; through the heartbreak of lost loved ones (due to cancer)(*See*, PSR, ¶ 56, page 15), he has struggled to maintain meaningful relationships - notwithstanding his short comings and failures.  Because of the abandonment he endured as a boy and young teen, by his father and his mother's paramours, Charles Guy has struggled to maintain a positive relationship with all of children, and to reverse the inter-generational trend of abandonment.  Charles Guy has a very strong and influential relationship with his son, Charles Guy.  And, after far too many years of incarceration, Charles Guy was in stride with cementing a very important relationship with his son Billy Guy, Jr.  This court would be impressed with young Billy Guy, Jr., who has learned from the mistakes of his father, and by all accounts, is off to a life free of criminal behavior and incarceration.  *See,* PSR, ¶ 55, page 15).   Perhaps the chain will be broken.  It is because of the continued possibility of redemption and hope that defense counsel requests that this court to exercise its discretion, and impose a sentence at variance with the guidelines.[6]

The Road Ahead To The Possibility of True Redemption

Charles "Billy" Guy is a member of a community which has, for all real time purposes, been left on its own to resolve staggering inter-generational problems and the impact on the derailment of lives that have persisted for decades.  However, Charles Guy is not alone in this effort.  There are several individuals from our community, some who have themselves been prosecuted here in the Southern District of New York, who are beginning to engage in effective interactions to assist individuals, like

---

[6] Your Honor is familiar with arguments long advanced by defense counsel that the guidelines fail to give any numerical value to the significant factors that influence and provide a gateway to the very same criminal conduct subject to punishment.  In fact, the Guidelines policy forbid the consideration of many of the factors present in the background of Charles Guy and other inner city offenders.  See, Guideline 5H1.12.  And, while those factors are mandated to be considered pursuant to 18 U.S.C. § 3553(a), the court is without any guides to determine how much of a numerical value is to be given to those powerful factors in any given case in relation to the guideline calculation. Astonishingly, in this case, the Presentence Investigation Report declares that notwithstanding the presence of these powerful negative risk factors in the life of the Charles Guy, that there is "no information" concerning the offender that would warrant a sentence at variance with the guidelines.  See, PSR, ¶ 97, page 21.  Such a conclusion is contrary to the modern view that untreated and unchecked negative risk factors do not dissipate, they compound and influence the defendant's ability to make better behavioral decisions.

Charles Guy, who have severed long prison sentences, by providing the necessary care, support and commitment to so that these individuals can reach their potential and overcome inter-generational problems of failure upon re-entry into society.

The Southern District's Unique Bridge Program

Several individuals, all of whom have been prosecuted here in the Southern District, are actively involved in a pilot program initiated by attorneys from our Criminal Justice Act Panel (CJA), with the endorsement of our court, to reach both young and long term offenders. Individuals such as Leonard Rollock, Jr., Pete Monsanto, Tony Windley, Janet Soto and Gerald Tisdale are committed to working with CJA counsel to provide supplemental assistance to those under indictment (including repeat offenders), and to aid those making a transition into society after decades in prison.[7]

The Philosophy of *Each One, Teach One*

For many from the outside looking in, the solution for those who find themselves in continued criminal conduct, after serving long prison terms, is more enhanced incarceration. In fact, in this case, without any analysis of the apparent contradiction between Charles Guy's sincere and genuine efforts to redeem his life and his relapse into the risks of narcotics dealing, the PSR recommends a sentence of 96 months. *See*, PSR, page 23. With all of its resources, and ability to reach offenders, Probation's remedy is enhanced incarceration. This is the sad legacy of mass incarceration.

For many of us who have addressed the issues faced by offenders upon re-entry for decades, we understand that while some offenders continue to make choices, their choices are not

---

[7] Your Honor may recall that in 2016 this court, under Docket No. 15 Cr. 334 (RA), imposed a sentence of 120 months upon Gerald Tisdale, although Gerald Tisdale, who was on supervised release having just completed a 20 year federal sentence under Docket No. 92 Cr. 621 (MCC), and whose guidelines, as a result, placed him in Criminal History Category II, a level 34 results in a guideline range of 168 to 210 months. Gerald Tisdale, who has served nearly 30 years of his life in prison, will join Leonard Rollock, Jr. (nearly 30 years in prison), Tony Windley, Sr. (nearly 27 years between state and federal prison), Pete Monsanto (nearly 35 years in prison) and Janet Soto (nearly 30 years in state and federal prison) in providing a support group, with solutions (other than continued Mass Incarceration) for a generation of men and women whose lives have been derailed and foretold by sustained and persistent societal impairments that existed long before their births, and whose parents', siblings' and other relatives whose lives were derailed and destroyed. This court will note that Damon Guy has also served several prison sentences in his life. *See,* PSR, ¶ 47, page 13, n. 5).

"autonomous," and that the combined negative risk factors that served to derail their lives in the first instance, often times remain present and perhaps more compelling today than decades ago.[8]

From one perspective, Charles Guy appears to be an individual who many would say "*has not learned his lesson*" from his many years in both state and federal prison; that his conduct now, in his mid 50s, demonstrates that he is neither capable of change, nor worthy of any exercise of discretion. On the other hand, there are some who would say that Charles Guy, like Gerald Tisdale, Leonard Rollock, Jr., Janet Soto and others, remains a member of our community, who now more than ever, while approaching his senior years, are deserving of our efforts to help him have a life free of the influence of powerful negative risk factors and more lengthy incarceration. There are some who have embraced the concept a solution from the long term damage of exposure to debilitating negative risk factors is a commitment to heavy therapy and guidance.

For many in positions of authority and influence in our system, there is simply a lack of patience and/or awareness of the complexities and depth of the derailing factors that are present, and continue to influence the lives of the offenders before our court. This phenomena is aggravated by the failure to recognize the profound realization; to wit: long term systemic negative risk factors persist as barriers to redemption in the lives the offenders before our courts, even after long periods of incarceration. This perspective is at the core of the wisdom expressed by Judge Weinstein's brilliant decision that recognized that drugs addiction, violence in community, enduring violence at home, dropping out of school, and drug usage has provided the gateway to criminal conduct with long term overwhelming

---

[8] For example, defense counsel presently represents the defendant in *United States v. Joseph Sapia*, Docket No. 99 Cr. 1193 (DLC). In that case, Joseph Sapia, who, at age 75 years, violated his supervised by release by relapsing and engaging narcotics activities despite a history of incarceration that includes a New York state court conviction in 1974 for narcotic trafficking, that carried a 15 year sentence, and a 1991 federal narcotics trafficking conviction in the Southern District, which resulted in the imposition of a 270 months (22.5 years) prison sentence. Judge Cote recognizing the long term influences impacting Mr. Sapia's life, now in his mid 70s, has imposed a mixed set of conditions which included some incarceration but with a heavy emphasis on drug counseling and therapy to address gravity of the problems that have persisted well into Mr. Sapia's advanced years of life.

inter-generational consequences.  See, *United States v. Bannister*, supra, 786 F. Supp. 2d at 621.

When I was a boy and teen growing up on 8th Avenue in Harlem, there was a community based program and organization that was known as "*Each One, Teach One.*"[9]  Founded in 1967, the mission of "*Each One Teach One*" was to provide Harlem kids with the nurturing, guidance and mentoring, through basketball, to overcome the staggering influences of narcotics and violence in the Harlem community.  See, https://teamunityinc.org/each-one-teach-one-at-rucker-park/  Little did I realize then, that this approach and concept would remain a viable solution to the persistence of the existence of the very same negative risk factors on the lives of individuals a half a century later - and after the implementation of mass incarceration has, as a solution, resoundingly failed.  Today, our courts are overwhelmed by young offenders who continue to suffer derailment of their lives from the sustained presence of powerful negative risk factors, that are confronted by those returning and making a re-entry into society after decades of incarceration.

After a lengthy and scholarly review of the confluence of the conditions of drugs and violence prevalent in the communities and in the lives of offenders before the court, Judge Weinstein observed:

> Had the defendants been raised by cohesive, adequate families, most of the difficulties they encountered would probably never have come to pass.  Well-resourced, attentive parents would have had the knowledge, ability, and insight to protect their children from many of the difficulties that befell these defendants in their youth, to obtain assistance to deal with their psychological and physical problems, and to obtain crucial opportunities for education, work, and personal growth.  Even those with learning disabilities would likely have been provided available resources to overcome their impairments at public expense.  That the defendants were born into circumstances without such support is at the center of this tragedy.

*United States v. Bannister*, supra, 786 F. Supp. 2d at 688-89.  For many, such as Charles Guy, the impact of that tragedy continues to influence their decision making.

Charles Guy has taken full responsibility for his criminal conduct that led to his prosecution on

---

[9] The origins of the phrase "Each One, Teach One" is an African proverb that is the result of the enslavement of Africans who were denied education.  The notion was that when someone learned how to read or write, it became their responsibility to teach someone else, and to pass that surviving knowledge onto others who were trapped in a vicious cycle of inhumanity.

16

the federal charges upon which he has entered a guilty plea, as Charles Guy has had an opportunity for reflection and is preparing for a long road ahead towards his 60s.

Recommended Sentence

The sentence of 78 months at variance with guidelines, along with four years of supervised release, is recommended, as a sentence sufficient but not greater than necessary to reach the goals of Congress. Charles Guy is presently 55 years of age. A sentence of 78 months (6.5 years) would mean that he would be in his early to mid 60s before he is eligible for release from prison again.[10] In addition, Charles Guy would be subject to supervised release by this court, which could result in his return to prison for up to an additional four years should he relapse into criminal conduct again.

In this case, Charles Guy has taken that important first step, by recognizing that he made a huge mistake in judgment that has caused damage to his relationship with his son and other relatives. Charles Guy, has had to reflect upon his legacy, along with the recognition that to date, has spent more than 21 years of his life inside state and federal prisons. Charles Guy has lost so many years of his life to criminal conduct, and now recognizes that even were this court to grant him leniency, he will nevertheless spend another decade of his life the penitentiary.

Charles Guy has taken a big first step to correct his mistake by early negotiations with the government and accepting responsibility for his conduct, and by also examining how his past conduct has impacted the lives of others, and expressing a desire to repair the damage that he has caused, particularly to his son.

Should this court impose a sentence above the statutory minimum, but at variance with the guidelines, Charles Guy has demonstrated, through his employment with "*Reverse The Trend*," (while on

---

[10] In addition to serving time for the sentence imposed by this court, in the United States District Court of New Jersey (Newark) under Docket No. 21 Cr 431 (BRM), Charles Guy is subject to imprisonment on his violation of supervised release to a guideline range of 30 to 37 months on a Grade A violation. Even upon a sentence of 78 months, Charles Guy faces more imprisonment, should the sentence for the violation be imposed to be served consecutive to the sentence rendered by this court. It is for this reason that we have requested that the Court state whether it has objection to the imposition of concurrent or partial concurrent time on the violation.

supervised release), that he does possess the requisite skills to pursue a lawful means to earn a living. All Charles Guy has to offer is hope and promises to this court, that in the future, he will work hard to accomplish the goal of transition back into society.  There is not much else Charles Guy has to corroborate his promises to do better.  Over the ensuing years of incarceration, Charles Guy will have ample time for deep reflection as he approaches his 60s and the realization that he is on the verge of forfeiting his entire adult life to incarceration.

### IV.  Conclusion

Notwithstanding the proliferation of scholarly work and the corroborating statistical data in support, there is nevertheless a continued reluctance for courts to embrace the painful reality that the conditions faced by many of the offenders before our courts for sentencing when they were children and teenagers have deep rooted long term consequences, and that there is no correlating relationship to the harsh mandatory sentences and calculated sentences recommended by following the guidelines.  See, *United States v. Bannister*, supra, 786 F. Supp. 2d at 668.  And, in relation to the federal sentencing guidelines, a sentencing regime that totally discounts, marginalizes and ultimately prohibits the consideration of these powerful influencing negative risk factors.

The federal sentencing guidelines fail to provide any numerical value to these powerful influences that help to explain Charles Guy's criminal behavior.  As a result, Charles Guy requests a sentence at variance with the guidelines pursuant to the court's authority under 18 U.S.C. §3553(a).

The application of guidelines strip Charles Guy of the individual factors that comprised his life and influenced the criminal conduct subject to punishment.  It is for the above reasons that Charles Guy requests that the court consider those factors, when imposing a sentence that is sufficient but not greater than necessary to reach the sentencing goals of Congress in this case.

Charles Guy requests that the court impose a sentence at variance with the guidelines of 78

months, to be followed by 4 years of supervisory release.[11]

Dated: New York, New York
      June 25, 2023

                                      Respectfully submitted,

                                      *Anthony L. Ricco*
                                      Anthony L. Ricco, Esq.

ALR/jh
cc:  AUSA Ashley Nicolas

---

[11] Lastly, defense counsel apologizes for the untimely submission of the defense sentencing recommendation. The court should be aware that counsel has been involved in three substantive back-to-back-to-back trials in the post COVID-19 time period: In the United States District Court in Philadelphia (6 weeks - 6 murder RICO prosecution); United States District Court in the Eastern District of New York (5 weeks - Somali Pirates case) and Bronx County Supreme Court (11 weeks - murder for hire). And, each sentencing submission always requires deep thought and reflection, which has resulted in the delay in filing. Nevertheless, defense counsel is aware that the court gives both the government and defense deep consideration, and that the government should have a fair opportunity to respond to the arguments advanced by the defense. As a result, the defense consents in advance to a continuation of sentence should it be required.